## Case No. 15,244.

### UNITED STATES v. GRAFF et al.

[14 Blatchf. 381.] [1]

Circuit Court, S. D. New York.   Jan. 22, 1878.

CONSPIRACY—PROOF OF—ACTS IN FURTHERANCE—
EVIDENCE—INDICTMENT—VARIANCE—TRIAL.

1. G. and O. were indicted for a conspiracy with S. and others to defraud the United States out of the duties on silks and laces to be imported contrary to law. The indictment set forth several acts done by several of the accused to effect the object of the conspiracy. On the trial of G. and O., only one of such acts, an act of O., was proved. Other acts, not set forth, done by the defendants to effect the object of the conspiracy, were proved, to show its character. S. swore to an agreement made by him with O., who was the purser of a steamer, that O. should bring in goods, which S. should sell, for a commission. Under this agreement. O. brought in silks in barrels and cases, which S. disposed of, no duty being paid. S. sent the proceeds to O. W. was employed on O.'s steamer. S. swore that W. introduced him to O.; that he, in W.'s presence, agreed with O. to dispose of silks which O. should bring out in the same way W. brought out his; and that there was, at the time, an agreement between S. and W., whereby W. was bringing, in the steamer, silks which were landed without paying duty, and sold by S. At the trial, letters from W. to S. were admitted as evidence for the prosecution, to explain the nature of the importations by W., and of the agreement between S. and O., and to corroborate the testimony of S. A witness was allowed to describe the marks on the heads of certain barrels, to identify them, without proving the destruction or loss of such heads. A written statement made by O., describing his connection with S. in smuggling silks, was admitted in evidence against O. It was sworn to. When O. made it, he was not under arrest, but he had been told he was charged with being connected with smuggling. He made it freely, without the influence of threat or promise. S., after the discovery of his guilt, fled, and wrote a letter to G., which never reached G. The letter spoke of O. and of the smuggling opera-

tions. There was evidence to show the connection of G. with O. and S., in the conspiracy. The letter, by its contents, was an act done in furtherance of the conspiracy, and was admitted in evidence against G. and O.

[Cited in U. S. v. Stone, 8 Fed. 255.]

2. The evidence considered which warranted the jury in finding that G. was a co-conspirator with S. and O.

3. A variance between the indictment, and the evidence, as to the time when the alleged overt act was committed, is immaterial.

4. A party cannot wait until evidence is given, and the case of the other side is closed, and then produce a stipulation, as ground for striking out such evidence.

5. The prosecution put in evidence the manifest of the steamer, written by O., and filed in the custom house. An affidavit endorsed on it, made by the master of the steamer, more than a month after such filing, was offered in evidence by the defence, and excluded.

[This was an indictment against Alvin Graff and Thomas Owen for conspiracy.]

Benjamin B. Foster, Asst. Dist. Atty., for the United States.

Abram J. Dittenhoefer, for defendants.

BENEDICT, District Judge. This case comes before the court upon a motion for a new trial. The defendants were charged with having conspired with one Scott and others, to defraud the United States out of the duties on silks and laces to be imported into New York from Great Britain, contrary to law. The indictment sets forth several acts done by several of the accused to effect the object of the conspiracy. Of the acts so charged, but one was proved—an act of the defendant Owen. Other acts, not set forth, done by the defendants to effect the object of the conspiracy, were proved, for the purpose of showing the character of the conspiracy. To sustain the indictment, Scott was called as a witness and testified to an agree-

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

ment between himself and the defendant Owen, according to which Owen was, from time to time, to bring over in the steamship the Queen, such goods as he might desire to import, which goods Scott was to dispose of for him, receiving a commission on the proceeds, as his compensation. In pursuance of this agreement, at frequent intervals during several years, silks were imported without payment of duty, packed in barrels generally, sometimes in large cases. From the steamer the goods went to a certain express office, and thence, in most instances, to a place selected by Scott, where Scott unpacked the barrels, altered the marks on the goods, repacked them, and then sent them to auction houses to be sold. There was no evidence that, in any instance, Scott saw the goods before their arrival at the express office, and there was no evidence that Owen personally took any part in landing the goods, or in their subsequent disposal. There was evidence of the transmission of the proceeds of sales by Scott to Owen.

In the course of the trial, various questions of law were raised and decided, some of which I am new asked to reconsider.

Of these questions, the first one presented on this motion relates to the admissibility of three letters written to Scott by one James Wells, dated respectively March 27th, April 1st, and May 1st, 1874. The admission of these letters as evidence against the defendants was objected to, but the letters were admitted. In order to exhibit the nature of the question raised by this objection, it is necessary to state, that there was evidence showing James Wells, the writer of the letters, to have been an employee on the Queen, of which vessel the defendant Owen was purser. Scott testified, that, in the year 1873, Wells introduced him to Owen, and, at that time, in Wells' presence, Scott agreed with Owen to dispose of silks which Owen then said he was going to bring out to this country in the same way Wells brought out his. In order to explain this direct evidence of an unlawful agreement between Scott and Owen, and to answer the position taken by the defence, that the agreement thus testified to did not relate to goods to be smuggled, Scott further testified, that, at the time of the introduction to Owen, an agreement was subsisting between him and Wells, by which Wells brought out, on nearly every trip of the steamer, silks which were landed without payment of duty, and sold by Scott. The letters under consideration were offered as further evidence to explain the nature of the importations made by Wells, and, so, explanatory of the agreement made between Scott and Owen, and as corroborative of Scott's testimony. The ground of the objection to these letters is, that they were written at subsequent dates, refer exclusively to future transactions, and form no part of the res gestæ, because they are not contemporaneous with the conversation they are introduced to explain. But, I adhere to the opinion, that they are evidence to show the nature of the business in which Scott and Wells were engaged at the time of the introduction to Owen, and for the following reasons: The evidence showed the agreement between Wells and Scott to be a continuing conspiracy. It did not relate to any particular package of goods, nor was it limited to any time. The agreement was to dispose of such goods and all goods that Wells might thereafter import. This agreement, at the time of the introduction of Owen to Wells, as also at the dates of the letters from Wells, was still subsisting and in continuous operation. Letters interchanged between Wells and Scott, in furtherance of that agreement, tend to show its nature and object, whenever written. They show a course of business, pursued, so far as the evidence discloses, without change. Although written subsequently to the introduction to Owen, and speaking of transactions contemporaneous with their writing, they become evidence of the nature of the arrangement existing between Wells and Owen at the time of the introduction to Owen, it having been shown that the arrangement then subsisting continued unchanged in character beyond the period when these letters were written. It may be conceded that these letters are not competent as being the acts of a co-conspirator, nor were they admitted as such. Their admissibility rests upon an entirely different ground, namely, that they tended to show what Owen meant when he said to Scott that his silks would be brought out in the same way Wells brought out his. Furthermore, the letters in question clearly corroborate the testimony of Scott as to the nature of the arrangement existing between him and Wells. I cannot doubt, therefore, that these letters were properly admitted, as tending to show that the arrangement between Owen and Scott related to defrauding the government of duties.

The next question presented on this motion is, whether it was error to permit a witness to describe the marks on the heads of certain barrels, without proof of the destruction or loss of the heads. I am unable to find error in this ruling. The point of inquiry was, whether certain barrels said by Scott to have been received at his place, were the same articles described on the manifest of the steamer the Queen, by certain shipping marks. The witness was allowed to describe the marks upon the barrels he received, for the sole purpose of identifying the articles. To such a question, the rule in regard to parol evidence of the contents of a document, has no application. Evidence of the character under consideration is properly admitted, when the object is to identify an article. Nor is the admissibility of such evidence confined to cases where the character of the article sought to be identified forbids its production

in court. In Com. v. Morrill, 99 Mass. 542, such evidence was admitted to identify a tag. See, however, Reg. v. Farr, 4 Fost. & F. 336.

The next point made is, that error was committed in admitting a written statement of Owen, describing his connection with Scott in smuggling silks. This statement was admitted as against Owen alone. It was made under the following circumstances: On the 2d day of July, 1877, Brackett, a special agent of the treasury, detailed to investigate frauds on the government, required Owen to accompany him to the custom house. There Brackett told Owen that evidence existed of his connection with smuggling operations, and desired him to examine the documents showing such connection. Owen, after seeing the papers in Brackett's possession, expressed a willingness to answer any questions Brackett might put to him concerning the matter. Brackett, thereupon, put to Owen various questions touching his connection with smuggling silks, which questions, and the answers, as Owen gave them, were taken down in a narrative form. The statement, thus reduced to writing, was then read over to Owen, and signed by him. After it was so signed, Brackett administered to Owen an oath that the statement was correct, and certified, upon the statement, that it had been subscribed and sworn to before him, as special agent of the treasury department. At the time of making the statement, Owen was not under arrest. To the admission of this statement, as evidence against Owen, objection was made, upon the ground, that, having been sworn to, it must be deemed involuntary; and the case of People v. McMahon, 15 N. Y. 384, is referred to as authority for the proposition of law, that any declaration made by an accused party, when under oath, and conscious of being charged with crime, is to be deemed involuntary, and, therefore, inadmissible. The case cited must be considered as modified by the subsequent decision of the same court, in the case of Teachout v. People, 41 N. Y. 7, where the reasoning of McMahon's Case is criticised, and so far overthrown as to forbid its being relied upon to furnish the rule applicable here. I am aware of no authority binding on this court, that forbids the admission of a statement like the one under consideration, nor does reason forbid. Certainly, the fact that a confession is made when under suspicion, does not render it involuntary. The contrary has been often decided. Nor can a confession be excluded by reason of the fact that the party making it was, at the time, under arrest upon a charge of having committed the offence. So it has often been ruled. It seems equally clear, that the fact of a statement being made under oath, does not prevent its being taken to be true. The reason why a sworn witness is permitted to decline answering, is, because his answers under oath can be used as evidence against him; and, to say that the administering of an oath to one under suspicion of crime, will, of necessity, cause a mental disturbance that must render unreliable the sworn admission of the crime, and raise the legal presumption that the statement is untrue, is going further than I can go, unless compelled by authority. I know of no authority binding upon the courts of the United States, which compels the holding that an arrest, or a charge of crime, or being sworn, or all three combined, are sufficient to exclude a confession that otherwise appears to have been freely made, without the influence of threat or promise. I agree entirely with the remark made by the court, in Shoeffler v. State, 3 Wis. 823, in admitting a statement given under oath at a coroner's inquest, after suspicion had attached, that a person under accusation, and substantially in custody, may "be pressed with questions in such a manner, and under such circumstances, as to render his answers compulsory." Here, no such facts appear. The accused was in no way pressed. Being confronted with evidence of his guilt, he deliberately acknowledged it, and, his acknowledgment having been written out and read over to him, he then freely signed it, and, thereafter, he swore to the truth of the statement he had so made. Such a statement is, in my opinion, admissible and convincing evidence against the accused. I am aware that statements taken under oath, by committing magistrates of this state, are not admitted in evidence. But, the statute of the state forbids the taking of statements under oath, by committing magistrates, and, by implication, the use of such illegal statements, as evidence, is forbidden. The statement under consideration was not taken in violation of any law. On the contrary, the power to administer the oath is conferred by section 183 of the Revised Statutes; and, as should be remarked, the statement contains information not only respecting Owen, but, also, respecting several other persons. The statements of the confession were pertinent to the inquiry then being prosecuted by the special agent—an inquiry in which, although it was, in no proper sense, a judicial proceeding, the agent was authorized by statute to administer an oath to any one supposed to have knowledge in respect to the matter in hand. For these reasons, I am of the opinion that the statement was properly admitted in evidence against Owen. It is proper to add, that, if the objection taken to the admission of the statement had been well taken, it was obviated by the offer of the district attorney to withdraw the confession before it had been read. Of course, if, when the offer to withdraw the confession was made, the contents of the statement had in any way come to the knowledge of

the jury, the offer would have been without effect. But, the objection to the admission of the confession was passed on by the court at the termination of the day's sitting, and, the next morning, before any publication of the contents of the paper, and without any part of it having been read in the presence of the jury, the district attorney made a formal offer to withdraw the paper. To this the defendants objected, and, in point of fact, the contents of the paper first became known to the jury by its being read by the defendants' counsel. Under such circumstances, the objection taken by the defendants to the ruling of the court upon the admissibility of the paper was rendered inoperative.

The next point made relates to the admission in evidence of a letter written by Scott and addressed to the defendant Graff. This letter was written and mailed by Scott at Troy, after his guilt had been discovered, and while he was on his way to Canada, in flight. It was addressed to Graff, and enclosed in a second envelope, addressed to one Nowell, a party cognizant of the frauds, and aware that Graff was in some way connected with or knowing to the same. The letter reached Nowell, but was stopped in his hands and never reached Graff. The following are its contents: "Dear Friend. Sold at last. Tell O. C. T. and E. H. O. to land nothing. This is a mystery to me. I suspect a party. Hope there was no trouble to N. & W. Saved by a hairbreadth. S." Prior to the offer of this letter, there was evidence to show that it had been arranged between Scott and Owen, that the letters O. C. T., when used in connection with their smuggling operations, should refer to the defendant Owen. There was, also, evidence for the consideration of the jury, to show Graff's connection with Scott and Owen, in the conspiracy. There being such evidence, the letter of Scott was clearly admissible against both Owen and Graff, if it was an act done in furtherance of the conspiracy. I ruled, upon the trial, that it was such an act, and for that reason admissible. To that ruling I adhere. The letter implies the existence on the steamer of goods intended to be landed in pursuance of the unlawful agreement, and it contains an express direction not to land the goods. The giving this direction was an act done to save from seizure, and to conceal, goods then forfeited to the United States by reason of their having been imported in pursuance of the agreement between those parties. Some goods had been seized, and Scott had fled, but, as to the goods referred to in the letter, the conspiracy was not at an end; for, the letter shows Scott endeavoring to procure action in respect to them, which endeavor, if it had been successful, would have saved from seizure goods that had become forfeited to the government. Any act looking

to the concealment of smuggled goods, so as to prevent their seizure, is an act in furtherance of the design to smuggle such goods. Upon this ground, the letter of Scott is admissible, and upon this ground alone was it admitted at the trial.

The next objection to be considered relates to the sufficiency of the evidence to warrant the jury in finding the defendant Graff to be a co-conspirator with Scott and Owen. As before stated, the evidence showed a continuing agreement between Scott and Owen relative to the smuggling of silks. This agreement was shown to have been entered into in 1873, and to have continued in operation up to the time of the seizure in 1876. Of the specific acts charged in the indictment as having been done to effect the object of the conspiracy, only one was proved, namely, the importation, without payment of duty, by Owen, in the year 1875, of 16 pieces of silk, in two barrels, marked (c). The claim in behalf of Graff is, that there was no evidence to show him connected with the conspiracy prior to 1877; and it is, therefore, contended, that he was entitled to an acquittal, because no act specified in the indictment was done subsequent to 1875. The difficulty with this position lies in the assumption that there was no evidence from which the jury had the right to infer that Graff was a party to the conspiracy prior to 1877. Scott testified, that, in June, 1877, he met Graff, by appointment, at Nowell's place, which was the place used for the reception, unpacking and preparing for sale, of the smuggled goods. At that interview, Graff stated that he came "to find out what those large cases contained that Tom Owen brought, because Owen was only paying him the same price for landing a large case as he did for landing a barrel," and, "for landing a barrel, he got five pounds." This inquiry by Graff, while it proves that he was at that time a party to the conspiracy, plainly implies a previous and continued employment by Owen. It might naturally be taken to mean that he landed all Owen's barrels for five pounds per barrel. It shows, further, an intimate connection between Graff and Scott, who was the recipient of the goods smuggled by Owen, and distributor of the proceeds. There was, also, evidence of several meetings between Scott and Graff, at Nowell's place, in 1877, and as early as April of that year, under circumstances indicating a knowledge, on the part of Graff, as to the use to which the place was put by Scott. The further fact appeared, that, at the outset, Scott and Owen understood that Graff would land the goods smuggled by Owen, and that they acted upon that understanding. This is shown by Scott's testimony, that, upon the presentation to him by Owen of an invoice of silks—and, as I understand it, the first invoice after the making of the agreement—in answer to the inquiry when the goods would be landed. Owen replied: "It all depended upon Graff—when

Graff said the word they would be sent to the express office." This declaration of Owen to Scott, made at the time of delivering an invoice, and for the purpose of enabling Scott to know when and where to go for the goods, is evidence to prove the fact, that, at the beginning of the conspiracy, Scott and Owen relied upon some other person, and that person Graff, to land the goods. This fact throws light upon the meaning of the language used by Graff in 1877, when he said that he got five pounds a barrel for landing the goods, and permits the inference that an agreement existed between Graff and Owen, in pursuance of which all Owen's barrels were landed by him for a compensation of so much a barrel. Furthermore, it was made plain by the evidence, that the assistance and connivance of some one on the dock, connected with the steamer, was necessary to effect the landing of the goods without discovery, and it was proved that Graff's connection with the steamer, and position on the dock, were such as to enable him to afford that assistance. From all these circumstances the jury were justified in concluding that Graff had rendered this assistance from the beginning. This view of the evidence renders it unnecessary to consider what would have been the result of a total failure of proof to show that Graff was connected with the conspiracy at the time of the commission of the only act charged in the indictment as done to effect the object of the conspiracy. I may, however, without intending to express an opinion upon the question, remark, that, if such proof be required, the requirement would seem to render it necessary, in order to draw an indictment, that the pleader should know the time when each party to a conspiracy joined himself thereto—a fact impossible to be known, in a case like the present.

The next question relates to the variance between the time when the importation set forth in the indictment, as made by Owen, to effect the object of the conspiracy, is charged to have occurred, and the time proven. It is supposed that the rule applied to an averment describing an act done to effect the object of the conspiracy, is different from that applied to the charge of the conspiracy itself; and expressions used by this court in deciding the case of U. S. v. Donau [Case No. 14,-983] are relied on as supporting this position. All that was decided in Donau's Case was, that, in an indictment for conspiracy, it was not necessary that particular acts stated in the indictment to have been done to effect the object of the conspiracy, should be so stated that the court could see, from the face of the indictment, that the object of the conspiracy would be accomplished thereby. In the remarks there ventured in respect to the offence created by the statute, it is nowhere suggested that the time of the commission of such an act must be proved as laid. Nor do I see any reason for applying to this part of an indictment for conspiracy, a rule more

strict than the rule applied to the statement of the conspiracy. The reasons which are the foundation of the rule, that a variance between the indictment and the evidence, in the time when the offence was committed, is immaterial, seem as applicable to the statement of the time when the overt act was committed, as to the statement when the conspiracy was formed. In indictments for the common-law offence of conspiracy, it is usual to state the conspiracy, and then show, that, in pursuance of it, certain overt acts were done; but no case has been cited where it has been held that a variance in the time of committing the overt acts was fatal. In high treason, the time at which the overt acts are alleged to have been committed need not be proved as laid; and it is sufficient if they be proved to have been committed at any time within three years before the finding of the indictment. See Archb. Cr. Pl. (17th Eng. Ed.) 723, where the law is so stated; and Charnock's Case, 1 Salk. 288. Rex v. Lord Balmerino, 9 State Tr. 587–605, and Townly's Case, Fost. Crown Law, 7, 8, are cited as authorities.

A different question, in respect to the time of the importation by Owen, arises out of the circumstance, that, before going to trial, the district attorney, in answer to a motion to postpone, gave a written stipulation to admit certain facts in regard to a shipment, by Owen, of two barrels containing silks, marked (c), in which stipulation the shipment is described as having occurred in Liverpool about the middle of June, 1875. Assuming that the stipulation in question should be regarded as having the effect of a bill of particulars, and entitling the defence to insist that the evidence be confined to goods shipped in Liverpool in June, it does not follow that the defence were entitled to have stricken out the evidence given in respect to goods that arrived in New York in December, because, as was conceded by counsel on the argument, the objection to the admission of the evidence was not placed on this ground. When the evidence was admitted, the attention of the court had not been called to the time mentioned in the stipulation, nor were the terms of the stipulation then claimed by the defence to have any bearing on the question of the admissibility of the evidence in respect to the importation of December. After the government had closed its case, and after the announcement had been made, on the requirement of the defence, that no further evidence would be offered to prove the overt act in question, for the first time the attention of the court was called to the time mentioned in the stipulation, and it was then insisted that all the evidence given in respect to an importation in December, must be stricken out and disregarded. But, it was too late then to bring forward the stipulation. A party is not permitted to wait until the evidence is given, and the case of the other side closed, and then, by producing a stipulation, make

foundation for a motion to strike out. Furthermore, the importation set forth in the indictment is described by the vessel, by the character of the goods, by the manner in which they were packed, and by the mark (c). The evidence admitted conformed in all these particulars to the indictment. It is a reasonable presumption that there was but one importation answering a description thus particular; and there has been no attempt to show, by affidavit, or otherwise, either that there were two such importations marked (c), or that the defendants were in any way misled by the difference in dates.

The only remaining question relates to the rejection of an affidavit of the master of the Queen, written on the manifest put in evidence by the government. This manifest, being the document required by law to be made, and proved to have been written by the defendant Owen, and to have been exhibited and certified as required by law, on the arrival of the vessel, was introduced for the purpose of showing an importation of the two barrels marked (c). described in the indictment. Upon inspection of the document, there appears written thereon an affidavit made by the master more than a month after the manifest had been made and filed at the custom house, in which affidavit the master states that certain of the goods mentioned in the manifest as composing the steamer's cargo, and, among them, two packages marked (c), were short shipped at Liverpool. Thereupon, it was insisted, in behalf of the defence, that this affidavit was part of the document, and legally in evidence as part of the case for the prosecution, although expressly excluded by the terms of the offer of the manifest in evidence; or, if not part of the case for the prosecution, that it might be read in evidence for the defence, without further proof. The affidavit was, however. rejected, and the correctness of that ruling is the point now to be considered. The ground taken is, that the subsequent affidavit of the master, written on the manifest, was part of the manifest. It is a self-disserving endorsement, it is said. and, in law, modified and controlled the prior statement of the manifest. In support of this position, reference is made to the case of entries of payment on a promissory note, or of satisfaction on a judgment roll. Lothrop v. Blake, 3 Pa. St. 483. But, a distinction exists between the cases. This manifest is not produced by the master of the vessel, nor by any one deriving title from him, as foundation for any right. The document offered by the government is the legal document required by law to be made, to show the goods on board the vessel, produced from the place of its legal deposit. The subsequent statement of the master, although written on this document, did not become part thereof. It was a mere statement of the master. attached. it is true, to the manifest, but forming no part of the legal document. It was part of another and different transaction, being the evidence adduced to explain to the authorities the discrepancy between the manifest and the officer's return, in pursuance of Rev. St. § 2887. I am unable to see any just ground for insisting that such a statement made ex parte, and without opportunity for cross-examination, is evidence as against the government, in a prosecution like the present.

I have thus considered all the questions to which my attention has been called upon this motion, and the result is, that no good ground for setting aside the verdict has been found. An order will, therefore, be entered, denying the motion. I further add, that I shall be prepared to hear a motion for sentence on Friday next, at the opening of court. In thus fixing a time at which a motion for sentence may be made, it is not intended in any way to trench upon the domain of the prosecuting officer. In criminal cases, judgment is not pronounced unless moved for by the prosecuting officer, and, by omitting to bring up the prisoner, and declining to move for sentence, that officer may, to use the language of the books, "exercise a virtual prerogative of pardon." 10 Petersd. Abr. p. 589, note, tit. "Information." Says the supreme court of the United States, in U. S. v. Murphy, 16 Pet. [41 U. S.] 203, 209: "Even after verdict, the government may not choose to bring the party up for sentence." Nevertheless, it is proper that the time when such a motion will be heard, should be stated in all cases, in order that the making, or the omission to make, a motion for sentence, as the case may be, shall duly appear of record.