**ANDERSON et al. v. UNITED STATES.**
**No. 8895.**

Circuit Court of Appeals, Sixth Circuit.

Dec. 4, 1941.

---

E. B. Baker, of Chattanooga, Tenn. (E. B. Baker, J. M. C. Townsend, Wilkes T. Thrasher, and Robert C. Hunt, all of Chattanooga, Tenn., and J. A. Lipscomb, of Bessemer, Ala., on the brief), for appellants.

J. B. Frazier, Jr., U. S. Atty., of Knoxville, Tenn. (J. B. Frazier, Jr., U. S. Atty., and Wm. E. Badgett, Asst. U. S. Atty., both of Knoxville, Tenn., on the brief), for appellee.

Before SIMONS, HAMILTON, and MARTIN, Circuit Judges.

HAMILTON, Circuit Judge.

Appellants, Mitchell Clifton Anderson, John Edward Simonds, Earl Hubbard, Felton Moore Woodward, Marion Luther Ellis, Robert Lee Ballew, John David Queen and Robert Lee Rhodes, were convicted for a violation of 18 U.S.C.A. § 88, by conspiring to commit an offense against the United States. They were charged with conspiring to violate 18 U.S.C.A. § 82, as amended, which makes it an offense to wilfully injure, or commit any depredation against any property of the United States or any branch or department thereof, or any corporation in which the United States is a stockholder. All of appellants, except Anderson and Ellis received sentences of two years to serve and fines of $1,000. Anderson received two years and a fine of $5,000. Ellis received fifteen months and costs.

Appellants assign five errors for reversal, one of which has been abandoned, the four remaining being:

(1) That the court erred in refusing to direct the jury to return a verdict of not guilty as to each of the appellants at the conclusion of the evidence. This assignment subdivides as follows:

(a) That there is no evidence that either appellant Anderson or Ellis was a party to the conspiracy alleged in the indictment;

(b) That, excluding the uncorroborated confessions or admissions of appellants Simonds, Woodward, Hubbard, Rhodes, Ballew and Queen, there is no evidence against any one of them;

(2) That the confessions and statements of appellants Simonds, Woodward, Hubbard, Ballew and Queen were incompetent evidence even if corroborated, because such confessions and statements were obtained under duress, threats and by intimidation, and through the hope and promise of rewards;

(3) That the court erred in not permitting certain questions to be asked a government witness on cross-examination;

(4) That the court erred in refusing to instruct the jury as requested by appellants.

The extra-judicial confessions of appellants Simonds, Woodward, Hubbard, Ballew and Queen, standing alone as to each of them, show the corpus delicti and their identity with the offense; also the scienter. In disposing of the first error, the question as to appellants Simonds, Woodward, Hubbard, Ballew and Queen is whether their confessions are corroborated by substantial independent evidence of the corpus delicti. As to appellants Anderson and Ellis, the question is whether there is substantial evidence of their participation in the conspiracy or in any of the overt acts charged in the indictment.

The jury having found appellants guilty, we must accept that view of the evidence which is most favorable to the government. Zottarelli v. United States, 6 Cir., 20 F.2d 795.

The Tennessee Valley Authority Corporation owned two power transmission lines carrying electricity to what is commonly called the "Copper Basin," in Polk County, Tennessee, both of which lines served the Tennessee Copper Company. The rupture of one of the lines would not disrupt service but the failure of both

would cause operations to cease in the plant of the Tennessee Copper Company.

On July 14, 1939, a strike was called at the mines of the Tennessee Copper Company at Copperhill, Tennessee, by the International Union of Mine, Mill and Smelter Workers, and the plant closed, but it was reopened on August 28th. The strike continued with various acts of violence, although many of the strikers went back to work. Appellants Simonds, Hubbard, Woodward, Ellis, Ballew, Queen and Rhodes, were members of the union and employed by the Tennessee Copper Company and all remained on strike and in the picket line. Appellant Anderson was national representative and organizer for the union and in charge of the strike.

At 12:04 a. m. on April 1, 1940, a transmission line owned by the Tennessee Valley Authority was dynamited, at which time the power on that line was entirely cut off and at 1:27 a. m. on the same day another line was dynamited, resulting in a complete power shut-off in the Copper Basin. On April 14, 1940, a steel structure power tower was blasted and the transmission line severed and thirty minutes afterward another tower was blasted, but the transmission line was only partially disconnected. Again on April 24th a steel structure power tower owned by T. V. A. was dynamited and a line severed and a short time later, on the same day, another power tower was dynamited, again resulting in a complete break in power in the Copper Basin, which caused operations to cease in the Tennessee Copper Company plant.

Freed Long, a former member of the International Union of Mine, Mill and Smelter Workers, was in Polk County when the strike was called at the Tennessee Copper Company mine, but ostensibly was not in its employ. During the course of the strike, he intermittently assisted the strikers and was in the picket line a part of the time. On April 13, 1940, Ott·Patterson told Long that some one wanted to see him at Willie McGhee's store, which was located about a hundred yards from Long's house. Long started to the store and on the way met Clyde Walden who told him he was wanted at appellant Anderson's office in Ducktown. Appellant Marion Ellis was at the McGhee store with appellant Anderson's automobile and he took Long in the car to Anderson's office in Ducktown. When they arrived at the office there were present, besides Anderson, Clint Huffman, Clyde Huffman, Johnny McGhee, a lady office assistant, Rans Smith and appellant Woodward. The two Huffmans and Woodward were leaving the office when Long arrived, but Anderson called them aside and talked with them a few minutes in a tone inaudible to Long. After their departure Anderson stated to those present that he and others were working on a plan to shut down the Tennessee Copper Company plant and he wanted Long to assist them. The means to be used in reducing or stopping production were discussed, and Anderson stated they intended damaging the mines inside. It was agreed to dynamite the magazine in one of the mines on the Sunday night following the meeting which would shut off the power.

On April 18, 1940, another meeting was held for the purpose of making further plans and arrangements for dynamiting the transmission lines of the Tennessee Valley Authority and the mines of the Tennessee Copper Company. Long was present at this meeting which was held at appellant Anderson's union office at Isabella, Polk County, Tennessee. There were also present appellants Anderson, Simonds, Woodward, Hubbard and Martin Simonds, Walter Bell, Wayne Henry, Meggs Collins and Johnny McGhee. After they assembled, the door was locked and discussion was had as to plans for dynamiting the power lines. Appellant Simonds protested assigning the two Green boys to again assist him in dynamiting the transmission lines and poles because he said on the prior occasion, April 14th, when he and the others dynamited the lines, the Greens ran off and were of no help. Appellant Anderson said he wanted the power towers and poles blown up again and it was agreed among those present that this would be done. Appellant Simonds was to make the necessary arrangements for the dynamiting of the Blue Ridge transmission line and appellant Woodward was to make the necessary arrangements for dynamiting the Ocoee and Parksville lines. The time agreed on for the dynamiting was April 24th and appellant Woodward said: "I am sure that we can go through with the lower end of it." It was first agreed Long should go down into the mine but afterward, because of his unfamiliarity with the layout, it was decided he should stand guard outside to protect the men who went down to dynamite the magazine and he was given

a high-powered rifle by appellant Hubbard for that purpose.

Immediately after these meetings, Long told Sheriff Biggs of Polk County, the names of persons in attendance at them and what appellants and their associates intended to do to stop the operation of the mine. He advised the Sheriff that the power lines and towers of the Tennessee Valley Authority would be dynamited at both ends of the line at 1:20 a. m. on April 24, 1940, and that the magazine at the Isabella mine would be blown up at the same time and three minutes before the time stated by Long, an explosion occurred on the Blue Ridge end of the line and forty minutes later the Parksville, or other end of the line, was dynamited. The lines were approximately twenty miles long. Sheriff Biggs stationed a number of deputies at the Isabella mine on the date and time Long said it was planned to dynamite it, and it was not blown up. The deputies, during the night, noticed a dog up close to the mine and the next morning discovered several shoe tracks within a hundred yards of the mouth of the mine.

Appellant Woodward, in his confession, stated that about April 7, 1940, his co-appellant Anderson instructed him to go to Chattanooga, Tennessee, and bring back to Copperhill some dynamite and that appellant Anderson would meet him later in the day at the Key Hotel in Chattanooga where he would be registered. He also stated that he arrived in Chattanooga about dark, went to a house on Newton Street and there left one of the parties who accompanied him and that then he and another party went to the Key Hotel and there met Anderson and the three of them, together with another individual, attended a speaking at the Hamilton County Court House.

The records of the Key Hotel in evidence show that appellant Anderson and his wife checked in on April 3, 1940, and checked out on April 4th; that they checked in again on April 4th and out April 5th; checked in on April 5th and out April 6th; checked in on April 8th and out April 9th; checked in on April 14th and out April 17th; checked in on April 22nd and out April 23rd.

Appellant Anderson testified that he was in Chattanooga on the night referred to in Woodward's confession for the purpose of meeting a conciliator from the Labor Department. Woodward also stated in his confession that in the course of the conversation between Anderson and him at the Key Hotel, Anderson said they did not have the necessary amount of dynamite and fuse and plans were made for Woodward and another person to drive Anderson's car to Bessemer, Alabama, to get more dynamite. He stated that the car was in the Key Hotel parking lot and Anderson told him to go to the Gulf filling station on Broad Street and wait there. Later Anderson came there with his car and put in Woodward's car a case of dynamite in a sack and told him "there was a sack of potatoes." Woodward then drove his car to a place on Newton Street in Chattanooga and spent the night and left the car there. The next morning Anderson again met Woodward at the filling station and turned over to him Anderson's car to be driven to Bessemer, Alabama, to get more dynamite. Woodward drove to Bessemer and parked Anderson's car and substituted another car which he drove to the Hercules Powder Company where he obtained three cases of 60% dynamite, 500 feet of fuse and a box of caps, for which he paid a little more than $21 and signed the name of John M. Cash to the sales slip. This dynamite was taken to Chattanooga, placed in Woodward's own car and by him taken to Copperhill.

The records of the Gulf Refining Company in evidence show that appellant Anderson possessed one of the company's credit cards and on April 9, 1940, purchased from C. H. Jones, operator of a Gulf gasoline station at Broad & Market Streets, Chattanooga, Tennessee, gasoline and oil amounting to $3.34.

The records of the Hercules Powder Company at Bessemer, Alabama, show that on April 9, 1940, John M. Cash bought three cases of 60% Extra LF dynamite, 500 feet Orange Wax Clover Fuse, and 100 No. 6 blasting caps for which he paid $21.78. Harry C. Phelps, who made the sale to Cash, identified appellant Woodward as the person who made the purchase under the name of John M. Cash. Three witnesses testified that near where the transmission lines were dynamited they found paper covering from dynamite and fuse wrapping paper which a fourth witness identified as being identical to that sold by the Hercules Powder Company and which was bought by appellant Woodward.

Appellant Simonds in his confession stated that he and those with him, after blasting one of the poles, walked from McCaysville, Georgia, to Copperhill by way of the Louisville & Nashville Railroad tracks, and when they were crossing a bridge over the Toceoa or Ocoee river, they threw in the river an augur which had been used to bore the holes in the poles to insert the dynamite. Simonds accompanied an agent of the Federal Bureau of Investigation and pointed out to him the exact spot in the river where the augur had been dropped. The agent recovered the augur where Simonds told him it would be found and it was introduced in evidence.

On March 31, 1940, about fifteen minutes before the first dynamiting of the towers and lines referred to in the evidence occurred, appellant Marion Ellis drove appellant Anderson's car into Ducktown, Tennessee, and stopped it about 150 or 200 feet from two deputy sheriffs who were watching him and let someone out of the car. It was dark and these officers were unable to identify the person who alighted. The officers attempted to follow the car but lost it in the darkness. Later about midnight, they overtook it, stopped and searched it and found a brace and bit on the floor board between the front and back seats. At that time appellant had in the car his wife and baby and stated to the officers that they were out riding because the baby had the colic. He also stated that during the night they left the paved highway and drove up a dirt road for the purpose of taking his wife over it, because it was unfamiliar to her. He also stated the person who had gotten out of the car earlier in the night was a hitchhiker whom he had picked up near Copperhill; that the man was a stranger to him and that he took him to where he wanted to go and let him out without ascertaining his name. He denied any knowledge of the presence of the augur in his car.

Appellant Ellis was a member of the Contract Committee for the strikers and during the strike spent practically all of his time in appellant Anderson's office and frequently drove Anderson's car and took persons to places as directed by him.

Appellants Robert Lee Rhodes, Robert Lee Ballew and John Davis Queen, testified they were members of the union and attended practically all of its meetings and actively participated in the strike referred to in the evidence. All repudiated every statement in their respective confessions concerning their participation in the dynamiting of the power lines. There is no other evidence in the record connecting any one of them with the charge laid in the indictment.

The undisputed ultimate facts show:

That property of a corporation in which the United States is a stockholder was wilfully injured in violation of U.S.C.A., Title 18, Section 82, 52 Stat. 198, and from the evidence it is fair to assume that the property was destroyed or injured pursuant to a conspiracy in violation of 18 U.S.C.A., Section 88, 35 Stat. 1096.

If the testimony of the witness Freed Long is worthy of credit, there is in the record proper legal, competent and substantial evidence, implicating the following appellants in the conspiracy: Anderson, Simonds, Woodward, Hubbard and Ellis. The fact that Long may have been a self-confessed active hired accomplice in the offense charged in the indictment does not require, as a matter of law, the rejection of his testimony. Valdez v. United States, 244 U.S. 432, 441, 37 S.Ct. 725, 61 L.Ed. 1242. The uncorroborated testimony of an accomplice is sufficient to support conviction. Ruby v. United States, 6 Cir., 61 F.2d 617.

Appellants urge on us that the uncontroverted evidence shows Long to be of such bad character that nothing he might say, standing alone, could properly be considered as substantial evidence from which a jury was warranted in finding beyond a reasonable doubt that the alleged conspiracy was proven. It may be fairly inferred from the evidence that Freed Long was a spy and a paid informer for the Tennessee Copper Company. Long's story, depraved and shameless though it may brand him, is not inherently improbable nor unreasonable, and the facts and circumstances in the case support what he said. The fact that his reputation for truth and veracity was bad as testified to by several witnesses goes only to his credibility and not his competency. The truth or falsity of his testimony was to be weighed by the jury which saw and heard him. Betz v. United States, 6 Cir., 2 F.2d 552.

Appellants urge on us that the confessions of Simonds, Woodward, Hubbard, Queen, Rhodes and Ballew which were received in evidence by the court

against each of them, were without corroboration and therefore highly prejudicial not only to the appellant making the confession, but to the other appellants involved thereby.

There is much division among authorities in respect to the rule of proof in cases involving confessions. The admissibility of such evidence so largely depends upon the special circumstances under which the confession is made that no fixed rule can be formulated which will comprehend all cases. The admissibility of such evidence is necessarily addressed in the first instance to the trial court, and appellate courts have refused to outline with certainty the limits of admission and exclusion. However, a confession, if freely and voluntarily made, is the most satisfactory type of evidence and "is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and therefore it is admitted as proof of the crime to which it refers." Hopt v. Utah, 110 U.S. 574, 585, 4 S.Ct. 202, 207, 28 L.Ed. 262.

In some of the states there is a statute providing that a confession shall not be sufficient to warrant a conviction without additional proof that the crime charged has been committed and that the confessor was probably connected with its commission. Independent of statutory provisions, the great weight of authority is against the sufficiency of a confession uncorroborated by other proof of the crime to warrant a conviction. The grounds upon which the rule rests are the hasty and unguarded character which confessions often have, the temptation which, for various reasons, a party may have to state what would best serve his interest whether true or false, and the likelihood of misconstruing or incorrectly reporting what has been said and the danger of conviction where there has been no crime committed and the difficulty of disproving what has been said.

As heretofore pointed out, confessions and admissions, when freely and voluntarily made, have been ever regarded as the most effectual proofs available. There is no greater likelihood of miscarriage of justice due to misconstruction or misreport of what has been said in a case where a person is accused of crime than in a civil action where one person undertakes to and is allowed to repeat what another has said. It is no doubt true that confessions are often made because of fear, with the hope of reward or from other motives, but confessions so obtained are rigorously excluded. When extra-judicial confessions are free from these inherent defects, we know of no good reason why they need corroboration, but because of the fixed rule of most courts that corroboration of a confession is necessary, we do not here feel free to cast it aside. We believe, however, the criticism of the rule expressed by Professor Wigmore is just. 4th Wigmore Evidence, 2d Ed.1923, Sec. 2070, p. 406.[1]

Corroboration means to strengthen or add weight and credibility to a thing. Evidence found in a confession need not be corroborated by other positive evidence, but all that is required is some proof that the crime charged has been committed or of circumstances corroborating and fortifying the confession. Proof of any of these facts and circumstances consistent with the truth of the confession or which the confession has led to the discovery of, tending to show the commission of the offense is sufficient corroboration.

Where an offense is committed, the "corpus delicti" is the act itself but where there is a conspiracy to commit such an offense, the corpus delicti is the

[1] The policy of any rule of the sort is questionable. No one doubts that the warning which it conveys is a proper one; but it is a warning which can be given with equal efficacy by counsel or (in a jurisdiction preserving the orthodox function of judges) by the judge in his charge on the facts. Common intelligence and caution, in the jurors' minds, will sufficiently appreciate it, without a laying on of the rod in the shape of a rule of law. Moreover, the danger which it is supposed to guard against is greatly exaggerated in common thought. That danger lies wholly in a false confession of guilt. Such confessions, however, so far as handed down to us in the annals of our courts, have been exceedingly rare (ante, § 867). Such a rule might ordinarily, if not really needed, at least be merely superfluous. But this rule, and all such rules, are today constantly resorted to by unscrupulous counsel as mere verbal formulas with which to entrap the trial judge into an error of words in his charge to the jury. These capabilities of abuse make it a positive obstruction to the course of justice.

conspiracy to do the act, and an overt act, pursuant to the conspiracy. In the case at bar, evidence other than the confessions is not required to be such as independently of them establishes the corpus delicti or the confessing defendants' guilt beyond a reasonable doubt. If there is in the evidence, in addition to the confessions, circumstances which, although they may be susceptible of an innocent construction, are nevertheless calculated to suggest the commission of the crime and for the explanation of which the confession of the particular defendant furnishes the key, the case cannot be taken from the jury for failure to show corroboration. All that is required is that there be such substantial corroborative circumstances as will, when taken in connection with the confessions, establish the corpus delicti beyond a reasonable doubt. Flower v. United States, 5 Cir., 116 F. 241.

The corroborating fact or facts may be found from facts material to proof of the offense discovered as a result of the confessions or they may be such as tend to prove the corpus delicti.

While most courts hold that a conviction cannot be had on extra-judicial confessions of the defendant, unless corroborated by proof aliunde of the corpus delicti, we think that it is not necessary that the evidence of the corpus delicti should itself connect the defendant with his participation in the crime in order to make the confession admissible. Ryan v. United States, 8 Cir., 99 F.2d 864.

Under the foregoing concept, the confession of appellant Woodward is corroborated by evidence aliunde of the corpus delicti, his purchase of dynamite from the Hercules Powder Company at Bessemer, Alabama, and the finding of the wrappers from the dynamite and fuse near the place where the explosion occurred and the similarity of the wrappers with those used on the dynamite purchased by him.

The confession of appellant Simonds is likewise corroborated by evidence aliunde of the corpus delicti and the finding of the augur in the river where he said in his confession it was thrown. The confession of appellant Hubbard is corroborated by the evidence aliunde of the corpus delicti and the testimony of Freed Long, who testified Hubbard gave him a rifle with which to guard the mine.

The confessions of appellants Queen, Rhodes and Ballew are corroborated only by the evidence aliunde of the corpus delicti which, in our opinion, is sufficient. Rosenfeld v. United States, 7 Cir., 202 F. 469; Berryman v. United States, 6 Cir., 259 F. 208; Wiggins v. United States, 9 Cir., 64 F.2d 950; Pearlman v. United States, 9 Cir., 10 F.2d 460, 461; Litkofsky v. United States, 2 Cir., 9 F.2d 877.

It is not permissible to introduce in evidence as against a conspirator the acts or declarations of a co-conspirator which were made or done after the conspiracy had come to an end, but in the case at bar the court instructed the jury that no extra-judicial statements of defendants implicating co-defendants could be binding on such co-defendants. In view of this instruction, the admission of the confessions in evidence does not constitute reversible error as to any of them. United States v. Dilliard, 2 Cir., 101 F.2d 829; Luteran v. United States, 8 Cir., 93 F.2d 395.

The strike of the International Union of Mine, Mill & Smelter Workers started at the plant of the Tennessee Copper Company on July 14, 1939, and the plant closed until August 28, 1939, when it was reopened. Broughton Biggs, Sheriff of Polk County, employed a number of deputy sheriffs and assigned them to the plant and its vicinity after it had reopened to prevent disorder and destruction of property. The Copper Company furnished a building referred to in the record as the "Y. M. C. A." in which the deputy sheriffs were housed. Bad feeling developed among strikers, the deputy sheriffs and working employees of the company. Much disorder occurred and destruction of the power lines by the use of explosives commenced April 1, 1940. The sheriff and his deputies investigated for the purpose of ascertaining the names of all the strikers who were expert in the use of dynamite. On April 16, 1940, agents of the Federal Bureau of Investigation came into Polk County for the purpose of investigating the destruction of the power lines, and conferred with the sheriff as to conditions. Many persons were interviewed by the sheriff and his deputies and after the agents of the Federal Bureau of Investigation came into the field, many of them were taken by the sheriff and his deputies without warrants to the Y. M. C. A. Building where they were interviewed by the Federal agents. Among those interviewed were twenty-one who were subsequently named in the present indictment as defendants. The court

directed the jury to return verdicts of not guilty as to eight of them and submitted the question of guilt of thirteen. Five of these were acquitted and the eight appellants here found guilty. All of the confessing appellants claimed they were subjected to surveillance, continuous examination and intimidation for long periods of time by the sheriff, his deputies and agents of the Federal Bureau of Investigation, and some of them claimed they were deprived of a place to sleep and food to eat and the appellant Robert Lee Ballew testified he was forced to accompany the agents of the Bureau from South Carolina to Copperhill, Tennessee. Appellants also testified that two of the agents promised them if they would "come clean" and confess, that the Department of Justice would recommend that each one confessing be paroled or placed on probation and that they would recommend to the Commissioner low bail. Appellants also testified they were held incommunicado and denied the right to see relatives, counsel or advisers for several days after they were taken into custody by the sheriff. The sheriff, his deputies and the agents denied all of these statements and testified affirmatively that none of the appellants were in any way mistreated and none of them deprived of food or a place to sleep or the right to see counsel or relatives.

▉▉▉▉ In reviewing the admissibility of a confession as evidence, it is the duty of the appellate court to consider the evidence in relation thereto as a whole, and acting judicially to determine whether or not there are facts or fair inferences to be drawn therefrom, which, if unanswered, would justify men of ordinary reason and fairness in concluding that the proffered confession was involuntary and resulted from improper inducements. Where the evidence as to the voluntary character of a confession, the absence of any threat, compulsion, inducement or assertion or indication of fear is not in dispute, the admissibility of a confession as such is a matter of law for the court to decide. However, where there is a conflict in the facts as to whether the statements were made freely, etc., the facts and the surrounding circumstances should be presented to the jury so that it may properly determine the weight to be given such evidence. Wilson v. United States, 162 U.S. 613, 624, 16 S.Ct. 895, 40 L.Ed. 1090.

Eliminating conflicts in the evidence and opposite inferences, it appears that the confessing appellants Woodward, Hubbard and Simonds were arrested without warrants and placed in custody for a period of six days without being taken before a magistrate or commissioner and that appellants Ballew, Rhodes and Queen were likewise held for more than twenty-four hours. It also appears that all of the appellants were detained at times in the Y. M. C. A. Building, at times in the County Jail and at other times in the County Court House. It further appears that while in the Y. M. C. A., they were surrounded by the sheriff and his deputies, all of whom were armed and by agents of the Federal Bureau of Investigation. They were intermittently questioned by the agents before their confessions were ▔ut in final form and reduced to writing. Each of the confessing appellants was a promoter of the strike at the plant and active in making it effective.

There is no showing that any of the appellants were of tender age or of weak intellect or that any of them were in a weakened physical condition so as to be easily persuaded to do something against their will.

▉▉▉▉ A confession may be voluntary, although made to police officers while in their custody and in answer to their questions where no compulsion is otherwise shown. Pierce v. United States, 160 U.S. 355, 357, 16 S.Ct. 321, 40 L.Ed. 454; Hardy v. United States, 186 U.S. 224, 229, 22 S.Ct. 889, 46 L.Ed. 1137; United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 157, 44 S.Ct. 54, 68 L.Ed. 221. The facts that the arrests may have been illegal or made without warrant and that arraignment was deferred, standing alone, do not render the confession involuntary and inadmissible.

▉▉▉▉ We perceive no principle upon which it can be held that a confession, if otherwise admissible, can be rejected for the reason that the prisoner was in custody upon an invalid process or without any process or lawful right. The confession, if voluntary, is admissible whether made to an officer or a private person, and the fact that the arrest was illegal has no relevancy. United States v. Graff, Fed. Cas.No.15244, 14 Blatchf. 381; People v. Doran, 246 N.Y. 409, 159 N.E. 379.

▉▉▉▉ A confession is not rendered inadmissible in evidence, solely on the ground that it was elicited by inquiries and questions asked of the accused. In the ab-

sence of anything else to indicate that the confession was induced by duress, intimidation or other improper influences, a confession is admissible in evidence even though obtained after prolonged examination by law enforcement officers. Perovich v. United States, 205 U.S. 86, 91, 27 S.Ct. 456, 51 L.Ed. 722.

 It is not error to admit in evidence a confession of the accused over the objection that before making the alleged confession, defendant had been refused an opportunity to communicate with counsel, nor is such evidence to be rejected solely on the ground that the accused at the time he confessed or at preliminary questioning was surrounded by law enforcement officers and denied the advice of counsel. Wilson v. United States, supra.

The case of Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, relied on by appellants in support of their contention that their respective confessions were inadmissible, is clearly distinguishable under the facts and lays down no rule of law inconsistent with the decision here.

Giving due weight to all the evidence in the record and all reasonable inferences to be drawn therefrom, we cannot say as a matter of law that the confession of any one of the appellants was extorted from him by the use of force or threats or the holding out of any inducement, or that he was intimidated by the presence of the officers or that his constitutional rights were invaded by reason of the absence of counsel. Appellants contend that the court erred in refusing to permit them to ask Sheriff Biggs how many deputies he had employed to guard the premises of the Tennessee Copper Company and whether or not they were paid by the Copper Company and also whether the Sheriff had instructed his deputies to search all cars passing over the highways in the vicinity of the mines. In our opinion, the proffered testimony was irrelevant and if answers had been elicited from the witnesses, they would have thrown no light on the issues in this case.

Appellants insist that the court should have charged the jury that before it could consider the alleged confessions, the jury must find that the confessions were freely and voluntarily made beyond a reasonable doubt and further charge that the confessions should be treated with distrust and scanned with care, because at the time made appellants were under arrest and surrounded by state and federal officers. A fair appraisal of the whole charge shows that the request of the appellants was substantially incorporated therein. However, it is not the law that there is a presumption against a confession or that the government carries a heavy burden in establishing its voluntary character and that this burden is not met if there is any evidence tending to impeach the testimony of those securing the confession. Gray v. United States, 9 Cir., 9 F.2d 337; Murphy v. United States, 7 Cir., 285 F. 801; Hopt v. Utah, supra.

Judgment affirmed.