PRICHARD v. UNITED STATES.

No. 10964.

United States Court of Appeals
Sixth Circuit.

April 4, 1950.

Judgment Affirmed June 5, 1950.

See 70 S.Ct. 1029.

Hugh B. Cox, Washington, D. C. (Leslie W. Morris, Marion Rider, Frankfort, Ky., Victor A. Bradley, Georgetown, Ky., Henry T. Duncan, William H. Townsend, Lexington, Ky., and Hugh B. Cox, Washington, D. C., on the brief), for appellant.

Claude P. Stephens, Lexington, Ky. (Claude P. Stephens, Lexington, Ky., Golden N. Dagger, George R. Gallagher, John J. O'Keefe, Jr., Washington, D. C., and I. S. Microutsicos, Washington, D. C., on the brief), for appellee.

Before SIMONS, ALLEN and McALLISTER, Circuit Judges.

SIMONS, Circuit Judge.

The appellant and his law partner, A. E. Funk, Jr., were indicted under § 241, Title 18 U.S.C.A. for conspiracy to stuff ballot boxes in certain precincts of Bourbon County, Kentucky, at the general election in November, 1948, which was, of course, a national election. Funk was acquitted but Prichard was convicted and sentenced. He contends that the district court erred in admitting the testimony of Judge Ardery in respect to a confession, over his claim of privilege; that there was no corroborative evidence of Judge Ardery's testimony to warrant submitting the case to a jury; that Funk, having been acquitted and the charge being conspiracy, the judgment against him should have been set aside, and finally, that the proofs failed to establish a federal offense.

The principal ground for the appeal as argued and briefed, relates to the testimony of Judge Ardery as to an interview solicited from him by Prichard, and this necessitates a recital of the circumstances which led to the conversation and the status of the parties at the time. Prichard is a lawyer with a career of marked distinction. Graduated from college and with a law degree from Harvard Law School, admitted to the bar in 1939, he had been research secretary to one and probably two of the present Justices of the Supreme Court, to the Attorney General of the United States and the Secretary of the Treasury, and was, at one time, general counsel of the Democratic National Committee. Returning from Washington to Kentucky a number of years before the incidents here involved, he practiced law in the Circuit Court of his county and in the Court of Appeals of the Commonwealth of Kentucky. He became a man of great influence in the politics of his state and county. Judge Ardery is a judge of the 14th Judicial Circuit of the State of Kentucky, had known Prichard all his life, especially since Prichard had been a school mate and later a law partner of his son, Philip. At the election 254 forged ballots had been placed in the ballot boxes of a number of the precincts in Bourbon County prior to the opening of the polls. On the night that the appellant, accompanied by Philip Ardery, sought the interview with the judge, the latter had already called a grand jury to investigate election frauds in the county. The grand jury was to meet the following morning at which time Judge Ardery was expected to instruct the grand jurors as to their duties and the scope of the investigation, as required by Kentucky law.

Prichard had gone to Philip Ardery, his former law partner, on Sunday evening,

November 7, 1948, for legal advice. Whatever conversation there was between them at that time was held by the district judge to be within the attorney-client relationship, so privileged, and is not here involved. Prichard and Philip Ardery, however, decided to consult Judge Ardery and drove to the judge's house, arriving there about 11 o'clock. Being advised that the interview which then transpired would be met by the claim of privilege on behalf of Prichard, the district judge heard evidence and argument *in camera* as to the nature of the evidence expected to be solicited from the judge, and limited interrogation with scrupulous concern for Prichard's rights. In view of Judge Ardery's official position, the duties he was then engaged upon in reference to the grand jury, the command of Kentucky statutes and the public interest, he concluded that one who seeks the advice of the judge of the court in which his case is to be tried is not entitled to the privilege accorded by law to confidential communications between an attorney and client. To allow the privilege under such circumstances would invite frustration of the administration of the courts by their duly elected and qualified judges. Such application would seem inimical to the public interest and a perversion of the purpose and spirit of the rule. He decided that Judge Ardery's testimony was admissible and would be received by the jury with caution as to its lack of bearing upon the guilt of the co-defendant.

At the preliminary hearing the judge had told the court that when Mr. Prichard appeared at his door that night he said, "Judge, I am in deep trouble and I want your advice." He then invited him into his home. To the jury the judge testified, "Mr. Prichard told me that he and two other young men prepared the ballots here in issue and put them in the ballot boxes before the election began." He said that he felt he could give Prichard legal advice and that if anything transpired later he would not sit in the case. Prichard gave him two details in regard to it. He said one of the young men wrote the names of the election officers on the ballots and that he stamped the ballot which scratched Senator Chapman. Prichard appeared greatly disturbed, both mentally and emotionally. His mind was not on the past. It was on the future, at what it might hold for him. "He asked me if I had a suggestion which would help him. I had none at that time." Asked whether Prichard had requested suggestions at any other time, the judge testified that he had on the following Wednesday. At this point the court excused the jury for the purpose of considering the competency of this additional evidence. Judge Ardery then explained, "I suggested to him that he go to his pastor and talk over the matter he had told me of. He didn't seem inclined to receive that suggestion favorably, and then I told him that in my opinion the sooner he got this question over and disposed of, the better it would be. My grand jury was then in session. * * * We understood each other as to what my words meant." While this second conversation was not permitted to go to the jury it has bearing upon the problem here involved.

 The privilege that attaches to the communications of a man to his lawyer is of ancient origin. "It is a salutary rule designed to secure the client's freedom of mind in committing his affairs to the attorney's knowledge." 5 Wigmore on Evidence, (2d) Ed. § 2306. "It is designed to influence him when he may be hesitating between the positive action of disclosure and the inaction of secrecy." It is the privilege, however, of the client which the attorney is bound to respect. As Wigmore elucidates it, § 2291, "It is worth preserving for the sake of a general policy; but it is none the less an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." As one court has put it, "The privilege is an anomaly, and ought not to be extended." Foster v. Hall, 12 Pick., Mass., 89, 97, 22 Am.Dec. 400. In the endeavor to phrase the general principle so as to represent all of its essentials, Wigmore undertakes to fashion a formula by which this may be accomplished. Its elements are (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the com-

munications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

We concern ourselves here primarily with the second element of the formula, and this leads us first to a consideration of Kentucky law. Section 30.-120, par. 1 of the Kentucky Revised Statutes, provides: "The Governor, the Lieutenant Governor when serving as Governor, a judge of the Court of Appeals or circuit judge shall not practice law in any court of the state except in cases in which he was employed previous to his election, or in which he is personally interested." Prichard contends that this does not impose general prohibition against the practice of law by circuit judges. It merely provides that circuit judges shall not practice law in any court of the state and the giving of legal advice carried on outside the courtroom does not constitute practicing law "in any court" within the meaning of the prohibition. There are no Kentucky cases construing the statute. There are state cases which would seem to indicate that a statute of such limited purport does not disqualify a judge from giving legal advice. People ex rel. Colorado Bar Ass'n v. Class, 70 Colo. 381, 201 P. 883; Appeal of Clark, 119 Me. 150, 109 A. 752. There are also cases which hold that even though a judge acts as a legal adviser in violation of statute, this does not affect his status as a lawyer so as to impair the rights of his client. They are noted in 48 C.J.S., Judges, § 9.

The present case, however, is *sui generis.* Judge Ardery was not merely a judge giving, as a lawyer, legal advice to a client—he was the presiding circuit judge of Bourbon County and as such had impaneled a grand jury which he was about to instruct concerning reported infractions of law upon which his advice was sought. By all standards of ethical conduct which govern the conduct of a judge it was morally, if not legally, impossible for Judge Ardery to enter into an attorney-client relationship with one whose conduct was to be investi-gated by a grand jury already called and about to be instructed, and this Prichard knew or must have known. It is true that no indictment against Prichard was returned by the local grand jury, but this was because the Federal Bureau of Investigation had taken over the inquiry and the state grand jury investigation was never completed. Prichard testified *in camera* that he knew Judge Ardery would be disqualified in sitting upon his case if an indictment against him were returned. By all the modern concepts of judicial ethics, the judge was not only disqualified from sitting on Prichard's case, but doubtless was also disqualified from organizing and instructing the grand jury once he was advised that the investigation would likely bring within the ambit of the inquest matters bearing upon the conduct of one who, upon the eve of inquiry, had already discussed with him participation in the very alleged unlawful conduct about to be investigated. We are not confined to the narrow limits of the Kentucky prohibition. The Kentucky Statute commendably reaches out toward a standard of judicial and professional propriety. It approaches but may not yet have reached materialization of prevailing modern thought upon the subject.

Canon 31 of Judicial Ethics promulgated by the American Bar Association on July 9, 1924, Reports of American Bar Association, Vol. 62, 1937, recites: "In many states the practice of law by one holding judicial position is forbidden. In superior courts of general jurisdiction, it should never be permitted." Canon 24 provides: "A judge should not accept inconsistent duties; nor incur obligations, pecuniary or otherwise, which will in any way interfere or appear to interfere with his devotion to the expeditious and proper administration of his official functions." Rule 209(B) of the American Law Institute's Model Code of Evidence, defines "lawyer" for the purpose of the sections dealing with privilege as "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation the law of which recognizes a privilege against disclosure of confidential com-

munications between client and lawyer." These concepts of propriety must have been known to a lawyer of the attainments and experience of Prichard. In our view they prohibit the possibility of existence between Prichard and the judge of an attorney-client relationship. To this may perhaps be added the general understanding of an informed laity that judges, at least those of appellate and the higher trial courts, should not and do not practice law.

While Prichard asserts he went to the judge for legal advice, and while the judge thought he might give such advice and then withdraw from any case that might result from the grand jury investigation, there is no suggestion in the record as to any advice sought or given that would constitute legal advice. Rather is there strong inference that Prichard sought the interview to ease a troubled conscience and sought it of Judge Ardery not in his professional capacity as a lawyer capable of giving legal counsel but as a wise and valued friend who had known him all his life. "I am in deep trouble and I want your advice," and so the judge seemingly interpreted it. "I suggested to him that he go to his pastor and talk over the matter he had told me of. * * * We understood each other as to what my words meant." So the second element of the Wigmore formula disappears.

Finally, Prichard's request for advice was robbed of the element of good faith once he knew, as know he did, that the judge was about to charge a grand jury in respect to election frauds. Whether we conceive the function of the judge in organizing and instructing a grand jury to be judicial or administrative is immaterial. In either capacity, knowledge of law violation may not be reposed in him under the cloak of privilege. As Wigmore puts it, § 2300, "A consultation with a judge, in his capacity as such, falls unquestionably outside the present privilege." Judge Ardery was currently engaged in ferreting out election frauds under the authority and command of the laws of his state. Knowledge that came to him while exercising this function could not be received by him in confidence. Whether judges of superior courts may ever enter into an attorney-

client relationship, we need not presently decide, even though voicing our doubts. It is sufficient to say for purpose of present decision, that a judge circumstanced as was Judge Ardery, may not enter into such relationship with a lawyer who may not deny knowledge of accepted notions of judicial propriety. There was no error in receiving Judge Ardery's evidence.

 A subordinate contention of the appellant is that even if the testimony of Judge Ardery was properly admitted there was insufficient corroborative evidence to justify the submission of the case to the jury or support the verdict in reliance upon the well-established rule that an extra-judicial confession is not in itself sufficient to support a conviction. Isaacs v. United States, 159 U.S. 487, 490, 16 S.Ct. 51, 40 L.Ed. 229; Anderson v. United States, 6 Cir., 124 F.2d 58; Wigmore, Evidence, 3d Ed. § 2071. But there is corroborative evidence. After the fraudulent ballots were discovered Prichard visited the State Police Commissioner to inquire whether the ballot paper would retain finger prints, and in at least one precinct Prichard asked the election board to go ahead with the voting even after the discovery of illegal ballots in the box. In Anderson v. United States, supra, we held that corroborative proof need not be such as independently of the confession will establish the *corpus delicti* or the defendant's guilt beyond a reasonable doubt.

 Again it is contended that the acquittal of Funk required the setting aside of Prichard's conviction on the ground that one person may not be guilty of a conspiracy. The indictment, however, charged Prichard with conspiring not only with Funk but with other persons unknown. It is the rule that all parties to a conspiracy need not be named in the indictment. Didenti v. United States, 9 Cir., 44 F.2d 537. If the indictment charges a conspiracy among named defendants and other persons unknown to the grand jury, and it appears at the trial that there was such conspiracy but that only one of the named defendants was a member of it, it is sufficient to support a conviction if it is shown by substantial evidence that the parties unknown at the time the indictment was returned com-

mitted overt acts therein alleged. Such evidence there was. The alleged conspiracy could not have been carried out by one person because it required access to the clerk's office, a careful removal of the stolen ballots so that their theft could not be detected, and the forgery of approximately 44 different signatures on 254 ballots, deposited in the ballot boxes of 11 precincts. The signatures on the ballots were not the signature of Prichard but were, according to the evidence, made in a number of different handwritings. It is the rule that the existence of a conspiracy may be established by inferences from circumstantial evidence. Johnson v. United States, 6 Cir., 82 F.2d 500, 504.

It is also urged that the charges in the indictment and the proofs of the government failed to establish an offense in violation of § 241. The indictment charges a conspiracy to injure and oppress specifically described citizens, namely, the voters of the particularly named precincts who voted for the Republican candidates. Section 241 penalizes conspiracies "to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." It is argued by the appellant that so phrased the section is limited to the protection of the individual rights of citizens and was not intended to vindicate a general interest in the purity of elections; that 254 forged ballots constituted but an infinitesimal fraction of the votes cast in the election and did not affect the outcome of a single contest in any precinct; that this, together with the fact that Bourbon County is traditionally Democratic, shows complete absence of any intent to affect the outcome of the election. The argument has no merit. It was rejected by the Supreme Court in United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341. The deposit of forged ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial. The right to an honest court is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States.

Finally, it is contended that the court's instructions to the jury that it might find one of the defendants guilty and the other not guilty is ambiguous and misleading. However, when read in context, and considered in the light of the entire charge to the jury, the ambiguity, if one exists, disappears, since the court was careful to charge the jury fully as to all of the essential elements of the offense and the requirements of proof.

The judgment below is affirmed.